**Jo-Anne E. COLEMAN, Plaintiff,**

v.

**SPECIAL SCHOOL DISTRICT NO. 1, et el., Defendants.**

**Civil File No. 3–95–603.**

United States District Court, D. Minnesota, Third Division.

March 26, 1997.

Timothy J. Pawlenty, Daniel Q. Poretti, Rider, Bennett, Egan & Arundel, L.L.P., Mpls., MN, for Defendants.

Roger C. Alderson, St. Paul, MN, for Plaintiff.

DAVIS, District Judge.

After being terminated from her position as principal of Lincoln Elementary School for failing to reveal a prior felony conviction on her employment application, Jo–Anne Coleman ("plaintiff") filed this lawsuit against Special School District No.1, Betty Webb, Daniel Loewenson, and Katrina Reed (collectively, "defendants") alleging deprivation of due process property and liberty interests, intentional infliction of emotional distress, and breach of contract claims. Before the Court is defendants' motion for summary judgment which, for the foregoing reasons, shall be granted with respect to the intentional infliction of emotional distress claim and denied as to the remaining claims.

## BACKGROUND

On November 2, 1992 plaintiff applied for the position as principal of Lincoln Elementary School ("Lincoln") with the Minneapolis Public Schools—Special School District No. 1 ("District"). The employment application which plaintiff submitted asked "Have you ever been convicted of a misdemeanor or felony ? If so, please explain." In response, plaintiff wrote "N/A," the same indication which she gave for the question regarding military service. On December 14, 1992, plaintiff was hired by the District under a written contract, the terms of which were to extend to May 31, 1994. The contract explicitly incorporated the provisions of the Teacher Tenure Act, Minn.Stat. § 125.17 (the "Act") and "all laws of the State of Minnesota relevant to .... termination and discharge for cause of teachers." Coleman Aff., Exh. B.

In 1985, plaintiff pled guilty to several counts of Medicaid fraud for which she served eighteen months in Shakopee Women's Prison. At the time of her conviction, plaintiff held a teaching license. Six months into her sentence, the Minnesota Board of Teaching reviewed plaintiff's license in light of her conviction and concluded that although her "conduct certainly fell below that which is expected of a licensed teacher .... [it] was not significantly related to [her] teaching license so as to warrant suspension or revocation ..." Coleman Aff., Exh. A. While serving her sentence, plaintiff obtained employment with the Shakopee School District where she worked for five years. In 1990, plaintiff was hired by the Minneapolis School District as an assistant principal intern and the following year she moved into an assistant secondary principal position with the Osseo Public Schools, which she left for the principal's position at Lincoln.

At the time that she was hired, plaintiff claims that the atmosphere at Lincoln was "turbulent and fraught with controversy." Plaintiff was the fifth principal at the school in the previous four months. Plaintiff's presence seemingly further divided an already unsettled environment; parents either ex-

pressed great support or extreme opposition to her leadership. Some of those opposed wrote letters to the District requesting that plaintiff be discharged. One such letter stated: "GET THAT GOD DAMN BLACK WIDDOW (sic) OUT OF THERE AS QUICKLY AS POSSILBE" (sic). Coleman Aff., Exh. D. Plaintiff claims that the teacher's union also actively sought to have her fired, devoting an entire meeting on one occasion to "Lincoln School Building Concerns and Issues Regarding Principal Joanne Coleman." Coleman Aff., Exh. C.

On May 7, 1993, Associate Superintendent and named defendant Betty Webb issued a written notice of deficiency to plaintiff for inappropriately handling an incident involving a Lincoln student. Webb. Aff., Exh. 1. The written deficiency came after an investigation and a meeting during which plaintiff was given an opportunity to respond to the allegations. *See* Coleman Aff., Exh. E. The deficiency stated: "Repeat instances of the deficiencies ... or other improper conduct may result in further disciplinary action, including termination proceedings pursuant to Minnesota Statutes § 125.17." Webb Aff., Exh. 1. The letter concluded by reiterating that "[i]f you fail to correct these deficiencies in an immediate and timely fashion, your continuing contract rights can be terminated pursuant to Minnesota Statute Section § 125.17." *Id.*

One month later, on June 7, 1993 Human Resources Director and named defendant Daniel Loewenson ("Loewenson") called plaintiff and asked her to attend a meeting the next day with Associate Superintendent and named defendant Katrina Reed ("Reed"). Plaintiff asked but was not told the purpose of the meeting. However, she was told that she could bring a union representative. Plaintiff claims that she had no expectation that the meeting would be a disciplinary or termination proceeding because in the past, such actions were preceded by seven day advance written notice sent by certified mail, informing the accused of the nature of the allegations, and providing an opportunity to respond. *See e.g.,* Coleman Aff., Exhs. E, F.

The following day, plaintiff arrived at Reed's office with her attorney, Alexander McKinney ("McKinney"). During the hour-long meeting, Reed informed plaintiff that the District had received anonymous information that she had a prior felony conviction. Reed told plaintiff that the District had conducted an investigation and obtained her criminal records which confirmed the allegation. Reed also showed plaintiff her employment application which undisputedly did not include any information about the conviction. Reed questioned plaintiff about the veracity of the criminal record and employment application; plaintiff acknowledged both. Reed then offered plaintiff an opportunity to resign in lieu of immediate discharge. McKinney, plaintiff's attorney, requested a hearing on the matter, to which Reed allegedly responded that plaintiff "had no right to any type of hearing." McKinney also requested additional time to consider and respond to the issues raised. Again, Reed responded that, absent a resignation, plaintiff would be terminated that evening at the Minneapolis Public School Board of Education ("Board") Meeting.

As forewarned, that evening Reed presented evidence concerning plaintiff's criminal conviction and her employment application at the executive session of the Board, which was closed to the public. Following the executive session, the Board held its regular, public meeting during which it voted to immediately suspend plaintiff for thirty days with pay and terminate her employment effective July 12, 1993. The Board's Agenda, which was printed five days earlier, included plaintiff's "release." Plaintiff and her attorney were present during the open meeting, but neither addressed the Board.

The next day, Reed sent a certified letter to plaintiff informing her of the Board's decision. The School District also distributed two statements concerning plaintiff's termination, both of which were disseminated to over 600 Lincoln students and staff. The first notice dated June 9, 1993 (the same day as her discharge letter) was unsigned and typed in large block letters. It read:

STATEMENT RELATIVE TO JO
COLEMAN, PRINCIPAL,

LINCOLN ELEMENTARY SCHOOL

June 9, 1993

Minneapolis Public Schools received and confirmed information that Lincoln Elementary Principal, Jo Coleman was convicted of a felony prior to being employed by the district and served time at the Shakopee Women's Reformatory related to this conviction. The District was not made aware of the conviction by Mrs. Coleman at the time Mrs. Coleman was employed. The District has suspended Mrs. Coleman with pay while these and other matters are being further reviewed and addressed.

Coleman Aff., Exh. I. In response to confusion about the origin of the notice, the District distributed another statement the next day, this time on School District letterhead. The second statement explained that the first unsigned notice (which was attached) was an official statement of the School District's Human Resources Department but that it had been erroneously released without being copied onto District letterhead.

■ Following her discharge, plaintiff filed a petition for writ of certiorari with the Minnesota Court of Appeals alleging that the termination violated her due process rights protected by the Fourteenth Amendment. The Court of Appeals denied plaintiff's writ.

The Minnesota Supreme Court summarily denied plaintiff's petition for further review. Plaintiff then filed this action seeking relief under 42 U.S.C. § 1983 for alleged deprivation of property and liberty interests. Plaintiff has also alleged breach of contract and intentional infliction of emotional distress claims. Before the Court is defendants' motion for summary judgment.[1]

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.*, 980 F.2d 1217, 1219–20 (8th Cir. 1992). To determine whether genuine issues of material fact exist, a court must conduct a two-part inquiry. The court must first determine the materiality from the substantive law governing the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material. *Id.* A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the

1. Subsequent to the hearing on their motion for summary judgment, defendants submitted a letter to the Court citing the Eighth Circuit's recent decision, *Bechtold v. City of Rosemount*, 104 F.3d 1062 (8th Cir.1997). In *Bechtold.* the court *sua sponte* raised the issue of whether a state court's decision upholding an employee's termination as legitimate bars the employee from raising MHRA and ADEA claims premised on his termination in a subsequent action in federal court. The court held that, based on the record before it, principles of res judicata did bar the subsequent claims and thus dismissed the suit. By drawing the Court's attention to *Bechtold,* defendants apparently are asserting an additional ground for dismissal, which was neither argued nor briefed by the parties previously.

This case is distinguishable from *Bechtold.* The record in *Bechtold* included evidence from a hearing during which *Bechtold* had the opportunity to call and cross examine witnesses and submit documentary evidence. The court specifically relied on the fact that the record was

"sufficiently developed" to *sua sponte* raise the res judicata issue and dismiss the claims. The record before us is incomparable to *Bechtold's* because there was no hearing. Moreover, the evidence submitted by the plaintiff to the Court of Appeals in support of her writ (an affidavit of Alexander McKinney, newspaper clippings, and the letter from the State Board of Teaching) was ultimately stricken from the record upon motion by the defendants. The Minnesota Court of Appeals noted the deficiencies in the record in its order opinion denying plaintiff's writ and specifically authorized her to proceed with this action: "On certiorari review, Coleman cannot present her constitutional claims where the factual record is insufficient because appellate courts cannot make factual findings, (citations omitted) . . . . [therefore] Coleman may pursue her constitutional claims through a civil suit or through grievance procedures under her union contract." (citation omitted) Hence, the Court rejects defendants' res judicata/collateral estoppel argument.

non-moving party. *Id.* at 248–49, 106 S.Ct. at 2510–11.

## II. DUE PROCESS PROPERTY RIGHTS

■ Plaintiff claims that by suspending and terminating her employment contract without providing due process, defendants violated her constitutionally-protected property rights. To establish a due process "property" claim, an employee must first establish a "legitimate claim of entitlement" to continued employment. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d · 548 (1972). Such protectable property interests are not created by the Constitution, but rather by an independent source such as state law or "understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* "Typically, the property interest arises from regulatory or contractual limitations on an employer's ability to terminate an employee." *Blankenbaker v. McCook Public Power District,* 940 F.2d 384, 385 (8th Cir.1991). When such an interest is found to exist, the employee is entitled to a hearing or some related form of due process prior to termination. *id.* (citing *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985)).

### A. Legitimate Claim of Entitlement to Continued Employment

■ Plaintiff argues that her written contract and the "for cause" termination provisions of Minn.Stat. § 125.17, the Tenure Teacher Act ("Act"), as incorporated by reference into the contract, created a legitimate claim of entitlement to employment with the District. Under the terms of the written contract, plaintiff was to receive $ 64,924.00 per school year for the period of December 14, 1992 through · May 31, 1994. Under the Act, as incorporated into the contract, the District may "discharge or demote a teacher [as defined in subd. 1 to include principals] for any of the causes as specified in this code." *See* Minn.Stat. § 125.17, subd. 2. Subd. 4 of the Act sets forth five justifiable causes for discharge "either during or after the probationary period," which include "im-

moral character, conduct unbecoming a teacher, or insubordination" and "inefficiency in teaching or in the management of a school." *Id.*

Plaintiff contends that the fixed-term of her contract coupled with the above-mentioned "for cause" discharge provisions created a legitimate expectation of continued employment and a constitutionally-protected property right in her position for the duration of her contract. In support of her argument, plaintiff cites *Moore v. Warwick Public School District No. 29,* 794 F.2d 322 (8th Cir.1986), wherein the court summarily affirmed the trial court's finding that a school superintendent had a constitutionally-protected property right in his continued employment "by virtue of his one-year contract with the school district." *Id.* at 326 (citing *Board of Regents v. Roth,* 408 U.S. 564, 576–77, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972)). Plaintiff also relies upon *Blankenbaker v. McCook Public Power District,* 940 F.2d 384 (8th Cir.1991) where the court held that the "discharge for cause" provisions in an employment agreement created a protectable property interest in employment for due process purposes. *Id.* at 387–388.

Notwithstanding these seemingly clear pronouncements that fixed-term contracts and "for cause" discharge provisions (both of which exist in this case) each create protectable property interests, the defendants argue that plaintiff's "probationary" status, as defined under subd. 2 of the Act, undercuts any constitutional-protectable right to continued employment plaintiff may otherwise have. The provision upon which defendants rely provides in pertinent part:

All teachers ... during the first three years of consecutive employment shall be deemed to be in a probationary period of employment during which period any annual . contract with any teacher may, or may not, be renewed as the school board shall sees fit. The school board shall adopt a plan for a written evaluation of teachers during the probationary period ... The school board may, during such probationary period, discharge or demote a teacher for any of the causes as specified in this code. A written statement of the

cause of such discharge or demotion shall be given to the teacher by the school board at least 30 days before such removal or demotion shall become effective, and the teacher so notified shall have no right of appeal therefrom.

Minn.Stat § 125.17, subd. 2. Defendants argue that the discharge provisions in subd. 2 fully contain all of the pre-termination rights owed to "probationary" employees like plaintiff—merely written notice of the "cause" for the discharge thirty days prior to termination. Because plaintiff undisputedly received such notice as required by the statute, she has no further claim of entitlement. Defendants contend that this sharp limitation on the scope of "probationary" employees' due process rights is well-established under Eighth Circuit and Minnesota case law. *See e.g., Johnson v. ISD. No. 281,* 494 N.W.2d 270 (Minn.1992); *McIntire v. State of Minnesota,* 458 N.W.2d 714 (Minn.App.1990) *Geddes v. Northwest Missouri State University,* 49 F.3d 426 (8th Cir.1995); *Batra v. Board of Regents of the University of Nebraska,* 79 F.3d 717 (8th Cir.1996).

The Court finds defendants' argument with respect to the effect of Minn.Stat. § 125.17, subd. 2 on plaintiff's constitutionally-protected property interests to be erroneous and their reliance on the above-referenced cases misplaced. First, defendants' suggestion that plaintiff's substantive constitutional property rights are somehow defined by or fully embodied within the pretermination procedures set forth in Minn.Stat. § 125.17, subd. 2 is premised upon an argument that was expressly rejected by the United States Supreme Court in *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). While the Board of Education in *Loudermill* did not contest the existence of a property right, as defendants do here, it did argue that since the pertinent state statute set forth the procedures for its deprivation, any "additional procedures would in effect expand the scope of the property interest itself." *Id.* at 540, 105 S.Ct. at 1492. Refusing to adopt this "bitter with the sweet" approach to defining employment rights, the Court stated:

[T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty. The right to due process "is conferred, not by legislative grace, but by constitutional guarantee." While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards.

*Id.* at 541, 105 S.Ct. at 1493 (citations omitted). In light of this straightforward directive, defendants' argument that plaintiff has no constitutional right to pretermination due process procedures (other than a notice letter) simply because Minn.Stat. § 125.17, subd. 2 arguably does not afford her any, must be rejected.

Next, while the Court appreciates the defendants' summation of the case law in this Circuit on the general proposition that "probationary" employees have no claim of entitlement to continued employment (and thus are not afforded due process upon discharge), the cases which establish that proposition are materially distinguishable from this case. In the cases which defendants cite, the discharged employee either had no formal employment contract, *see McIntire, Geddes, supra,* or the employee's claim of entitlement was premised upon refusal to *renew* an employment contract or extend tenure. *See Johnson, Batra, supra.* It is undisputed that absent unusual circumstances a teacher without tenure or a formal contract has no legitimate entitlement to continued employment protected by the due process clause. *See Geddes* at 429. However, in this case, plaintiff had a formal contract that was not expected to end until May, 1994. That fact distinguishes this case from those cited by the defendants and, in this Court's opinion, independently, creates a legitimate property interest. *See Moore, supra.* Moreover, plaintiff is not challenging the non-renewal of

a contract, as in *Johnson* and *Batra,* but rather the mid-year termination of her contract; again, a material fact which distinguishes this case.

In addition, as plaintiff points out, there is a difference between "probationary" as defined by subd. 2, and the more common meaning of "probationary," which usually denotes an employment at-will status. Considering the two express limitations on defendants' ability to terminate her—the fixed-term contract itself and the "for cause" discharge provisions of Minn.Stat. § 125.17, subds. 2, 4 as incorporated into the contract—plaintiff clearly was not an at-will employee. In addition, the language in plaintiff's May, 1993 performance deficiency which cautioned that failure to correct her behavior would result in termination of her "continuing contract rights" further reveals the parties' understanding that plaintiff's was more than an "at-will" employee, notwithstanding her "probationary" status with respect to contract renewals.

Nonetheless, defendants urge the Court to overlook the contract terms, including the "for cause" provisions, and treat "probationary" status under subd. 2 as the functional equivalent of "at-will" employment. Because such an interpretation would effectively make meaningless the "for cause" termination provisions, the Court rejects defendants' proposition. As the *Blankenbaker* court found, "if the limitation of 'discharge for cause' was not to have legal effect, then it was absolutely unnecessary to include it in the Employee Agreement in the first place." 940 F.2d at 387; *cf. Tautfest v. City of Lincoln, Nebraska,* 742 F.2d 477 (8th Cir. 1984)(absent an express contract for a fixed term or other source of property interest stemming from state law, probationary employee had no expectation of continued employment or protected interest in his job).

In sum, the cases that defendants upon which rely stand for the proposition that "probationary" or non-tenured employees have no legitimate claim of entitlement to continued employment with respect to renewal of annual contracts, extension of tenure, or in situations where no other source of entitlement exists. That general proposition is neither disputed nor relevant in this case. Here, the plaintiff's fixed term contract is an independent source upon which her claim of entitlement rests which takes this case outside of the *McIntire, Johnson* line of cases. The fact that as a "probationary" employee plaintiff had no constitutionally-protectable right to renewal of her contract at its end, does not preclude her from having a legitimate claim of continued employment up until it ends. *See Moore, supra.* Plaintiff had a protectable property interest in her position based on the contract and the "for cause" provisions incorporated therein; her "probationary" status as defined by Minn.Stat. § 125.17, subd.2 did not strip her of that interest. Therefore, plaintiff could not be discharged without due process.

## B. Notice and Opportunity to be Heard

■ Having determined that plaintiff was entitled to due process, the Court's inquiry necessarily turns to the question of what "process" was due. Under *Loudermill,* the "root requirement" of the Due Process Clause is "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." 470 U.S. at 542, 105 S.Ct. at 1493. While some kind of pretermination hearing is required, it need not be elaborate. *Id.* at 545, 105 S.Ct. at 1495. In general, "something less" than a full evidentiary hearing is sufficient. *Id.* Moreover, the hearing need not definitely resolve the propriety of the discharge; rather, it should serve as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545–46, 105 S.Ct. at 1495 (citation omitted). "The opportunity to present reasons, either in person or in writing, why [the] proposed action should not be taken is a fundamental due process requirement." *Id.* at 546, 105 S.Ct. at 1495 (*citing* Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267, 1281 (1975)); *see also Powell v. Mikulecky,* 891 F.2d 1454, 1458 (10th Cir.1989) (pretermination hearing is employee's chance to clarify basic misunder-

standings or to convince employer that termination is unwarranted).

In this case, plaintiff does not dispute the veracity of the charges against her; she admits that she was convicted of a felony which was not disclosed on her employment application. Instead, plaintiff asserts that she was never afforded an opportunity to explain, argue, answer, or respond to the charges of misrepresentation or the efficacy of the District's reliance on a seven year old conviction as a "for cause" basis for termination. Plaintiff argues that she was denied a *Loudermill* hearing, and even if the meeting with Reed did amount to such a hearing, she still did not receive proper notice or a meaningful opportunity to be heard.

Defendants respond that the meeting with Reed satisfied *Loudermill's* hearing requirements, that plaintiff was given notice of the charges when the meeting began, that she had an opportunity to respond to the charges during the hour-long meeting but chose not to, and that given the straightforward and undisputed nature of the charges, a more elaborate hearing was unnecessary. On these facts, defendants argue, summary judgment is appropriate. Viewing the record in the light most favorable to the plaintiff, the Court must disagree.

As to the notice issue, it is undisputed that plaintiff did not receive prior notice of the purpose of the meeting with Reed; Loewenson only told her that she could bring a union representative. In addition, plaintiff claims that she had no expectation that the meeting would be a disciplinary or termination hearing because, in the past, such proceedings were preceded by advance written notice sent by certified mail explaining the alleged misconduct and identifying a time and date when the employee could respond. Plaintiff argues that defendants' intent to deny her prior notice is further revealed by the undisputed facts that Reed knew, well in advance of the June 8, 1 993 meeting, about the "anonymous" allegations of her conviction, the subsequent investigation, and the School Board's predetermined intent to discharge her. The School Board's Meeting Agenda, which was printed five days prior to plaintiff's discharge and specifically mentioned

her "release," supports plaintiff's argument. Plaintiff contends that rather than disclose the allegations which would have provided a chance for her to prepare a response, defendants withheld the information until the meeting date and thus deprived her of her constitutional right to notice.

Likewise, plaintiff claims that during the meeting with Reed (assuming that it was a "hearing" under *Loudermill* ), defendants denied her a meaningful opportunity to be respond to the substance of the charges against her or to offer any evidence of mitigating circumstances that may have weighed against termination of her employment. Plaintiff claims that the sole purpose of the hour-long meeting with Reed was to verify the accuracy of the criminal conviction and the authenticity of her employment application, not "to allow [her] the opportunity to present h[er] case and have its merits fairly judged," which is the fundamental purpose of the due process clause. *Pollock v. Baxter Manor Nursing Home,* 716 F.2d 545, 546 (8th Cir.1983). Plaintiff argues that defendants' "ambush" tactics, apparently employed to force an on-the-spot resignation, simply do not comport with the spirit of *Loudermill's* notice and hearing requirements.

The purpose of a pretermination hearing is to provide "some opportunity for the employee to present h[er] side of the case [which] is recurringly of obvious value in reaching an accurate decision [about terminating an employee] ... [because] dismissals for cause often involve factual disputes ... even where the facts are clear [as defendants argue in this case], the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decision maker is likely to be before the termination takes effect." *Loudermill* at 543, 105 S.Ct. at 1493–94. Based on the record before it, the Court simply can not conclude that, as a matter of law, plaintiff was afforded pretermination notice or a meaningful opportunity to "tell her side of the story" to Reed or to the Board (the ultimate decision makers); that question must be resolved by a jury. Of course, there is no guarantee that "telling her story" would

have changed the School Board's decision, however, the constitutionally-protected right to do so does not depend on a demonstration of such success. *See id.* at 544, 105 S.Ct. at 1494–95 (*citing Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1978) and n. 9). Therefore, defendants' motion for summary judgment on plaintiff's due process property claim shall be denied.

## III. DUE PROCESS LIBERTY CLAIM

█ Plaintiff claims that defendants' actions also infringed upon her due process liberty interests. Specifically, plaintiff argues that the defendants, without providing prior notice or a meaningful opportunity to be heard, distributed two notices concerning her conviction, imprisonment, and termination to over 600 parents and staff at Lincoln which created a false and misleading impression about her. Plaintiff argues that defendants' distribution of the stigmatizing statements affected her credibility, "good name" and reputation in the community, and her ability to secure future employment and thus violated of her constitutionally protected liberty interests.

█ To establish a due process liberty interest, a discharged employee must show that "the reasons for the discharge stigmatized h[er] and that the defendants made the reasons for the discharge public." *Payne v. Ballard,* 761 F.2d 491, 493 (8th Cir.1985) (*citing Bishop v. Wood,* 426 U.S. 341, 347–49, 96 S.Ct. 2074, 2078–80, 48 L.Ed.2d 684 (1976)). When a public employee's termination is accompanied by publication of stigmatizing statements which might impair future employment opportunities, she has the right to a pretermination "name-clearing" hearing at a meaningful time. *Schleck v. Ramsey County,* 939 F.2d 638, 642 (8th Cir. 1991). As with property interests, the scope of such hearing is dictated by *Loudermill. Id.* at 643 n. 5. Even in cases where the stigmatizing information is true, plaintiff is still entitled to nominal damages if the defendants failed to hold a due process hearing. *See Pollock v. Baxter Manor Nursing Home,* 716 F.2d 545, 546 (8th Cir.1983) (*citing Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1978)).

Clearly, the statements at issue were publicized based on the fact that they were distributed to over 600 students and staff. There is, however, a factual dispute over whether the statements were stigmatizing. *See Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972)(charges of dishonesty or immortality are implicitly stigmatizing). There is also an fact issue over whether plaintiff received adequate notice and a meaningful opportunity to be heard prior to the publication. Given these fact disputes and in light of the Court's ruling on the property claim, defendants' motion for summary judgment on the liberty claim must also be denied.

## IV. QUALIFIED IMMUNITY

█ Plaintiff has named Reed, Webb, and Loewenson, as individual defendants in this action. The individual defendants argue that they are entitled to qualified immunity.

The question of whether a defendant is entitled to qualified immunity is a question of law to be determined by the trial court. *McIntosh v. Arkansas Republican Party–Frank,* 856 F.2d 1185, 1186 (8th Cir.1988). Qualified immunity is generally available for "government officials performing discretionary functions … insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In order for a right to be clearly established, for purposes of determining whether qualified immunity applies, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what [s]he is doing violates that right.…[I]n light of pre-existing law the unlawfulness must be apparent." *Schleck v. Ramsey County,* 939 F.2d 638, 641 (8th Cir.1991) (*citing Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). The applicable standard is objective reasonableness. *Id.* Thus, if the law as related to the relevant facts is not clearly established and if a reasonable official could have believed the alleged conduct was lawful, qualified immunity applies.

Based on the record before it, the Court concludes that the individual defendants are not entitled to qualified immunity. First, the law is well-established that a public employee with a property interest in continued employment is entitled to a pretermination hearing. *Loudermill, supra.* The evidence in this case suggests that the individual defendants were quite familiar with the *Loudermill* notice and hearing requirements; they had actually participated in such proceedings during the the period of time that plaintiff was employed with the District. In fact, just one month earlier in May, 1993, the individual defendants had provided plaintiff with these same protections during disciplinary proceedings against her. Any assertion by the individual defendants that they did not know plaintiff was entitled to such protections upon termination are simply incredulous in light of their prior actions. Moreover, the fact that the individual defendants knew enough to inform plaintiff that she was entitled to representation during the meeting with Reed, yet did not think to disclose the purpose of the meeting, supports plaintiff's allegation that the decision-making concerning her discharge was deliberate and the course of action strategic. Finally, even if defendants did not know that terminating plaintiff in the manner in which they did violated clearly established due process rights, as highly placed supervisory employees handling School District personnel matters on a regular basis, the individual defendants should have known as much. Accordingly, the motion to dismiss plaintiffs' claims against the individual defendants on qualified immunity grounds is denied.

## V. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

 Plaintiff, by her complaint, has also alleged a state law claim of intentional infliction of emotional distress. Plaintiff claims that the dissemination of the written statements concerning her conviction and discharge was sufficiently egregious behavior to support an emotional distress claim or, at very least, that material fact issues surround defendants' actions which preclude summary judgment. To establish a claim of intentional infliction of emotional distress, plaintiff must show that the defendants, by extreme and outrageous conduct, intentionally or recklessly caused her to suffer severe emotional distress. *Hubbard v. United Press Int'l,* 330 N.W.2d 428, 437–39 (Minn.1983). Construing all of the recorded evidence in her favor, the Court concludes that plaintiff has not shown "extreme and outrageous" conduct necessary to establish an intentional emotional distress claim. The conduct giving rise to this sharply limited tort must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Id.* at 438–439. Even if the Court were to conclude that defendants acted recklessly or even maliciously toward plaintiff, the conduct before the Court is not beyond human decency. Accordingly, defendants' motion for summary judgment on plaintiff's state law claim of intentional infliction of emotional distress shall be granted.

## VI. BREACH OF CONTRACT

 Finally, plaintiff alleges a breach of contract claim. Under the contract provisions, the School District could only terminate plaintiff "for cause," which Minn.Stat. § 125.17, subd. 4 defines as "immoral character, conduct unbecoming a teacher, or insubordination." Whether plaintiff's misrepresentation or omission concerning her prior conviction amounts to "cause" for termination raises a fact issue that can not be resolved on summary judgment.

Accordingly, IT IS HEREBY ORDERED that defendants' motion for summary judgment as to plaintiff's intentional infliction of emotional distress claim is GRANTED;